IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

PETROLEUM PRODUCTS, INC., et al.,

               Plaintiffs,

v.                                    CIVIL ACTION NO.  2:09-cv-00425

COMMERCE AND INDUSTRY INSURANCE
COMPANY, et al.,

               Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the court is the defendants' Motion to Dismiss Complaint Pursuant to Rule 12(b)(3) [Docket 11].  The Motion is **DENIED**.

**I.  Factual and Procedural History**

*A.  Facts*

This is an insurance coverage dispute.  The sole issue presented by the defendants' Motion is whether the forum selection clause in the governing insurance policy requires dismissing or transferring this case.

Petroleum Products, Inc., Bulk Plants LLC, and Bulk Plants, Inc. (collectively the "plaintiffs"), are West Virginia corporations with their principal place of business here.  They operate a petroleum bulk plant near Pineville, West Virginia (the "plant").  The plant processes petroleum-based products, which are stored in underground tanks.  Products such as gasoline and diesel fuel are transferred from the underground tanks to aboveground containers through a piping system.

The transfer system has a containment mechanism that collects water runoff and any leaking fluid from the above and belowground tanks. This containment mechanism discharges to an underground tank called an oil water separator ("OWS"). Oil is retained in a storage tank, while water is discharged.

On January 14, 2002, petroleum products that had been stored in underground tanks were accidentally released to the environment. The cause of the accident, the plaintiffs assert, was a frozen discharge line in the OWS. This caused a backup in the OWS, resulting in petroleum products being discharged to the ground outside. During the cleanup, the plaintiffs discovered that additional petroleum products had previously been discharged from a leaking valve. The plaintiffs assert that this additional release was not caused by the frozen OWS line. The plaintiffs timely reported both discharges (the "petroleum product discharges") to the West Virginia Department of Environmental Protection ("DEP").

On January 18, 2002, DEP ordered the plaintiffs to investigate the environmental impact of the petroleum product discharges. The plaintiffs contracted with an environmental engineering firm, Potesta & Associates, Inc. ("Potesta"), to survey the plant. Potesta issued a report of its survey on March 1, 2002 (the "Potesta report").

After reviewing the Potesta report, DEP directed the plaintiffs to investigate further. The plaintiffs again contracted with Potesta. Potesta drilled a number of monitoring wells at the plant and gathered soil samples. Its investigation revealed petroleum hydrocarbons and related products in the soil in amounts exceeding regulatory limits.

As a result of this investigation, the plaintiffs submitted a corrective action plan (the "CAP") to DEP. The CAP contained the remedial actions that the plaintiffs would take to reduce the

-2-

petroleum hydrocarbon impact at the plant.  DEP approved the CAP in February 2004.  The plaintiffs retained Potesta to implement the CAP.

According to the plaintiffs, monitoring wells at the plant continue to show the presence of petroleum hydrocarbons, requiring "an extended future performance of the CAP over a period of years or the addition of new remediation efforts to complete the remediation in a more limited time period."  (Compl. ¶ 38.)  The plaintiffs have paid all of the remediation-related expenses at the plant.

### 2. The policy

In January 2002, the plaintiffs had an insurance policy (the "policy") with Commerce and Industry Insurance Company ("Commerce").[1]  The plaintiffs contend that the policy covered "reasonable and necessary costs of the insured for corrective action resulting from confirmed releases from pollution conditions from the underground tank system as well as cleanup costs of pollution conditions from above ground storage tanks."  (Id. ¶ 30.)

Particularly pertinent to the defendants' Motion, the policy contained a forum selection clause (the "forum selection clause" or the "clause").  The clause provides the following:

> In the event that the Insured and the Company dispute the meaning, interpretation or operation of any term, condition, definition or provision of this Policy resulting in litigation, arbitration or other form of dispute resolution, the Insured and the Company agree that the law of the State of New York shall apply and that all litigation, arbitration or other form of dispute resolution shall take place in the State of New York.

(Id., Ex. 1 at 25.)

### 3. The claim

_____

[1]  According to the plaintiffs, defendants AIG Domestic Claims, Inc., and AIG Consultants, Inc., were agents for Commerce.  The plaintiffs assert that all three companies are subsidiaries of defendant American International Group, Inc. For ease of reference only, I refer to these defendants as "Commerce."

In October 2002, the plaintiffs filed a claim under the policy for the costs associated with the cleanup and remediation of the petroleum product discharges (the "claim").  No action was taken on the claim at that time, because the claim did not exceed the deductible under the policy.

In the summer of 2007, the plaintiffs informed Commerce that the expenditures had exceeded the deductible.  Commerce responded that it had not received all relevant expense documentation pertinent to the claim.  The plaintiffs supplied that information in September 2007.  The plaintiffs contend that they have continued to supply Commerce with all pertinent expense documentation related to the cleanup and remediation at the plant.

On October 18, 2007, Commerce notified the plaintiffs that the policy did not cover the entire claim.  In particular, Commerce stated that the OWS was not a part of the underground storage system insured by the policy and, therefore, the OWS-related discharge was not covered.  Furthermore, Commerce stated that any discharges that occurred prior to the policy date of December 22, 1998, were not covered.

The plaintiffs began demanding that Commerce pay the entire claim.  After some correspondence regarding coverage, an Commerce employee inspected the plant in January 2008, along with an environmental engineer retained by the plaintiffs.

On February 4, 2008, the plaintiffs received payment from Commerce, though it was for an amount less than what the plaintiffs had requested.  Commerce enclosed no calculations or explanations for the amount of the payment.  After an inquiry by the plaintiffs, Commerce responded that it was still investigating the claim.  "In a series of correspondence and emails" between the parties, Commerce maintained that it was not required to pay the entire claim.  (Compl. ¶ 53.)

-4-

To expedite payment of the claim, the plaintiffs hired an outside engineering firm to investigate the cause of the petroleum product discharges.  That investigation revealed that the OWS was not the source of the August 2002 discharge, and that no discharge had occurred prior to December 22, 1988.  The plaintiffs provided this report to Commerce.

On June 17, 2008, Commerce informed the plaintiffs that it wanted to conduct an inspection at the plant and that it had retained defendant Arcadis as an environmental consultant.  The inspection would require drilling near the OWS.  Out of concern that drilling could damage equipment at the plant, the parties agreed that Arcadis would indemnify the plaintiffs for any damage caused by the drilling.

Arcadis, along with a subcontractor, defendant Kodiak, began drilling at the plant.  The drilling punctured the OWS, causing an additional discharge of petroleum products to the environment.  Because of the damage caused by the drilling, the OWS had to be replaced.  The plaintiffs demanded that Commerce, Arcadis, and Kodiak indemnify them for the damage.  The plaintiffs assert that their request has gone unanswered.

Finally, on February 9, 2009, an inspection conducted by Enviroprobe Integrated Solutions, Inc., an engineering firm retained by the plaintiffs,  "confirmed that the OWS had not been leaking and had not been the source of ground and groundwater contamination that is the subject of the CAP."  (*Id.* ¶ 64.)  On March 11, 2009, the plaintiffs wrote to Commerce, demanding $56,610.05 for indemnification under the policy, approval of a plan to remediate the plant, and "a commitment to fund [the plan's] performance."  (*Id.* ¶ 65(b).)  Commerce denied the claim on April 8, 2009.

*B.  Procedural History*

The plaintiff filed the Complaint on April 24, 2009, asserting breach of contract against Commerce, wrongful refusal of the policy and unfair trade practices against "the AIG parties," and negligence against Arcadis and Kodiak.  The defendants filed a Motion to Dismiss Complaint Pursuant to Rule 12(b)(3) on May 20, 2009, contending that the forum selection clause compels dismissal of this action.  The plaintiffs filed a Response on June 3, 2009, claiming that the forum selection clause is not enforceable.  On September 17, 2009, a motion hearing was held, and the parties presented their respective positions.

**III. Discussion**

The sole issue pending before the court is whether this case should be litigated in this district, be transferred to another federal district, or be dismissed.

The defendants assert that the parties have contractually agreed to resolve this dispute in New York and that venue is therefore improper in this district.  The plaintiffs contend that the forum selection clause is not implicated, and, in any event, the court should decline to dismiss the case because enforcing the clause would contravene West Virginia public policy.

Resolving this issue requires several steps.  First, I must determine whether the forum selection clause is implicated.  Second, if it is, then I must assess whether the clause is valid.  Third, if the clause is valid, then I must determine how it should be enforced.  Finally, I must decide whether to enforce the clause.

*A.  This action implicates the forum selection clause*

The Complaint asserts that "Commerce has breached the terms of the Policy in failing and refusing to pay the said past and future expenses of the Plaintiffs for the Corrective Action."  (*Id.* ¶ 73.)  The crux of this lawsuit is whether the policy obligates the defendants to pay the plaintiffs'

-6-

claim under the policy.  The parties clearly dispute "the meaning, interpretation or operation of any term, condition, definition or provision of this Policy resulting in litigation."  As such, the forum selection clause is implicated.

### B. The forum selection clause is valid

Although this court is sitting in diversity, federal, not state law, governs the enforceability of forum selection clauses in federal court.  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28-29 (1988).  Forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004); *Int'l Software Sys., Inc. v. Amplicon, Inc.*, 77 F.3d 112, 115 (5th Cir. 1996).  A forum selection clause may be unreasonable if (1) there was fraud or overreaching in its formation; (2) enforcing the clause will result in a forum so inconvenient that the objecting party will be deprived of its day in court; (3) enforcing the clause would deprive the objecting party of a remedy; or (4) enforcing the clause would contravene the public policy of the forum state.  *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991).

The plaintiffs only challenge the validity of the forum selection clause on the basis that enforcing it would violate West Virginia public policy.  West Virginia's public policy, they contend, "includes [its] interest in safeguarding its citizens and the land, air, and water in connection with a state licensed and regulated facility located in West Virginia that is insured by the defendant company licensed and regulated in West Virginia." (Pls.' Resp. Mot. Dismiss 1-2.)  They assert that enforcing the forum selection clause would contravene that public policy.  They further argue that

"there is no nexus with New York and no New York interest at stake in the cleanup of petroleum contamination in West Virginia." (*Id.* at 2.)

The plaintiffs have failed to show that the forum selection clause is invalid. Simply because a lawsuit involves underlying environmental pollution in West Virginia does not mean that enforcing the clause would contravene the state's public policy. The Supreme Court of Appeals of West Virginia has explained that forum selection clauses do not violate West Virginia public policy *per se*. *Caperton v. A.T. Massey Coal Co.*, __ S.E.2d __ (W. Va. 2009), 2009 WL 3806071 (W. Va. Nov. 12, 2000); *Gen. Elec. Co. v. Keyser*, 275 S.E.2d 289, 292 (W. Va. 1981) ("Unquestionably, forum selection clauses are not contrary to public policy in and of themselves . . . ."). Having shown no direct conflict with West Virginia public policy, the plaintiffs present only a generalized challenge to forum selection clauses, the exact type of challenge that the Supreme Court of Appeals has rejected. Therefore, the forum selection clause is valid.

    *C. Transfer, rather than dismissal, is the appropriate procedural vehicle*

The defendants have moved to dismiss this case based on improper venue under Federal Rule of Civil Procedure 12(b)(3). While Rule 12(b)(3) provides such a procedure, transfer is the preferred remedy to dismissal when a forum selection clause dictates that another federal forum is the proper venue for litigation. *Stewart*, 487 U.S. at 32 ("We hold that federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum-selection clause and transfer this case to a court in Manhattan."); *Salovaara v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 299 (3d Cir. 2001) ("[A]s a general matter, it makes better sense, when venue is proper but the parties have agreed upon a not-unreasonable forum selection clause that points to another federal venue, to transfer rather than dismiss.").

While the Fourth Circuit has affirmed Rule 12(b)(3) dismissals based on forum selection clauses, it has only done so in cases where the forum selection clause at issue provided for adjudication in a foreign jurisdiction.  It has not affirmed a forum-selection-clause-based dismissal when the clause provided dictated another federal forum.  *Baker v. Adidas Am. Inc.*, 2009 U.S. App. LEXIS 14162 at *3 (4th Cir. June 30, 2009) (per curiam) (explaining that the forum selection clause "provided that any claim . . . would be governed by the law of the Netherlands and settled by Amsterdam courts"); *see also Sucampo Pharms., Inc. v. Astellas Pharma., Inc.*, 471 F.3d 544, 546 (4th Cir. 2006) (describing forum selection clause that "contained a Japanese choice-of-law provision and a forum-selection provision").  Indeed, dismissal makes sense when the identified forum is a foreign jurisdiction or a state court, because, in that situation, there is no other action that a federal court could take.  A federal district court lacks the power to transfer a case to those courts.

Two federal statutes authorize a district court to transfer venue of a case to another district: 28 U.S.C. §§ 1404(a) and 1406(a).  These statutes, while worded similarly, serve different functions.  Section 1404(a) provides for a situation in which venue is technically proper in the district where the suit is initiated, but the convenience of the parties and "the interests of justice" are better served in another district.  This provision essentially codified the forum non conveniens doctrine.  Section 1406(a), however, is used in a situation where venue is improper in the district where a suit is initiated, but venue is proper in another district.  *See Wright v. Comm'r of Social Sec.*, 2008 WL 2246043 at *2 (E.D. Mich. May 30, 2008) ("In short a transfer under § 1404 must be from proper district to proper district and a transfer under § 1406 must be from improper district to proper district.").

In this case, transfer under § 1404(a) is the proper procedure to enforce the forum selection clause. The plaintiffs filed suit in the Southern District of West Virginia, where venue is proper. *See* 28 U.S.C. § 1391. The issue presented is whether in light of the forum selection clause, it would be more appropriate for this case to be litigated in another federal district.[2]

   D.  *Transfer would be inappropriate under § 1404(a).*

A plaintiff's choice of forum is generally accorded great weight. *See Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947) ("[T]he plaintiff's choice of forum should rarely be disturbed."). In the ordinary motion to transfer under § 1404(a)—where the plaintiff has chosen a forum and the defendant seeks transfer to another forum—the defendant bears the burden of showing that another forum is more convenient and would better serve the interest of justice. But when the parties have entered into a valid contract governing forum selection, this burden shifts. The defendant seeking transfer under the forum selection clause is not attempting to circumvent the plaintiff's forum choice. Rather, the defendant is enforcing the plaintiff's *ex ante* choice of forum under the contract. *See Stewart*, 487 U.S. at 33 ("[E]nforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system.") (Kennedy, J. concurring). Therefore, when there is a valid forum selection clause, the plaintiff bears

---

   [2]      In most cases dealing with venue in conjunction with a forum selection clause, the defendant seeks dismissal and, in the alternative, transfer. Here, the defendants seek only dismissal. The defendants' decision not to request transfer appears irrelevant, as district courts may order transfer sua sponte. 28 U.S.C. § 1404(a); *Carver v. Knox County, Tenn.*, 887 F.2d 1287, 1291 (6th Cir. 1989); *Knierim v. Siemens Corp.*, 2008 WL 906244 at *19 (D. N.J. Mar. 31, 2008) (transferring case on the court's motion); Cascade *Promotion Corp. v. AMA Sys.*, LLC, 2007 WL 1574544 (N.D. Cal. 2007) (transferring case to District of Maryland based on forum selection clause); *Mouch v. BellSouth Advertising & Pub. Corp.*, 2004 WL 1687231 (E.D. La. 2004) (transferring case to Northern District of Georgia).

the burden of showing that the alternative forum identified in the forum selection clause is inconvenient and not in the interest of justice.

Although a forum selection clause should be "a significant factor that figures centrally in the district court's calculus" of whether to transfer a case, its terms are not dispositive.  District courts should still assess whether to transfer the case under § 1404(a).  *See id.* at 29-30 ("The flexible and individualized analysis Congress prescribed in § 1404(a) thus encompasses consideration of the parties' private expression of their venue preferences.").

Section 1404(a) provides that for "the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought."  Other factors must be considered, such as "the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'"  *Id.*  at 30-31. Because § 1404(a) codified the forum non conveniens doctrine, courts often apply forum non conveniens factors to determine whether to transfer a case under § 1404(a).  *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("[W]e have adopted the private and public interest factors first enunciated in *Gulf Oil Corp.*[], a forum non conveniens case, as appropriate for the determination of whether a § 1404(a) venue is for the convenience of the parties and witnesses and in the interest of justice.").

In deciding whether to transfer this case under § 1404(a), I am aware that other federal courts have declined to dismiss or transfer cases based on this very same forum selection clause in cases involving litigation against Commerce.  *See D/H Oil & Gas Co. v. Commerce & Industry Ins. Co.*, 2005 U.S. Dist. LEXIS 42791 (N.D. Fla. 2005); *Keweenaw Konvenience, Inc. v. Commerce &*

*Industry Ins. Co.*, 2001 U.S. Dist. LEXIS 247 (W.D. Mich. 2001).[3]  These cases are particularly

persuasive here.

### 1. *Private-interest factors weigh against transfer*

In deciding whether to transfer a case under § 1404(a), courts should consider certain

"private interest" factors.  These factors include

> the relative ease of access to sources of proof; availability of compulsory process for
> attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;
> possibility of view of premises, if view would be appropriate to the action; and all
> other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gulf Oil*, 330 U.S. at 508 (deciding forum non conveniens issue).

In *Keweenaw Konvenience, Inc. v. Commerce & Indus. Ins. Co.*, the owner of a gasoline

station had an insurance policy with Commerce to cover its underground storage tanks.  The policy

contained the same forum selection clause at issue in this case.  The gasoline station learned that its

underground tanks had leaked, and it filed a claim under the policy.  Commerce refused to pay, and

the gasoline station sued for a declaratory judgment.  In denying a motion to dismiss or transfer

based on the forum selection clause, the court focused on the inconvenience that transfer would

cause, partiularly with regard to the location of witnesses and documentary evidence.  2001 U.S.

Dist. LEXIS 247 (W.D. Mich. January 11, 2001).

---

[3]         A third case involving this forum selection clause was decided in New Jersey
state court.  In *Petroleum Corp. v. Commerce & Industry Ins. Co.*, an appellate court declined
to transfer a case under the forum selection clause. 686 A.2d 377 (N.J. Sup. Ct. 1997). That court,
however, decided the issue on state law.  It explained that New Jersey views forum selection
clauses as "presumptively invalid."  *Id.* at 167 (quoting *Kubis & Perszyk Assoc., Inc. v. Sun
Microsystems, Inc.*, 680 A.2d 618, 626  (N.J. 1996)).  That view of forum selection clauses does
not prevail under federal law or West Virginia law, and that decision is thus distinguishable.

The court explained that private-interest factors "strongly weigh[ed] in favor of . . . keeping th[e] case in Michigan."  Most of the likely witnesses would be found in Michigan, along with documentation of the plaintiff's claims.  Furthermore, the availability of process in Michigan would alleviate having to "tr[y] the case by deposition," and reduce the costs of obtaining willing witnesses.  And the fact that "the locus of the events in dispute . . . [were] overwhelmingly centered in Michigan" lead the court to predict that "th[e] matter could be tried more expeditiously and inexpensively in Michigan than in New York."  *Id.* at *11-12.

The court also emphasized that, while the forum selection clause evidenced the parties' *ex ante* preferences, "the fact that the forum selection provision is part of a boilerplate insurance contract merits some consideration." *Id.* at *12.  Although "the burden [wa]s on Plaintiff to establish that Michigan [wa]s a substantially more convenient place" to litigate the case, the plaintiff "overcame the heavy burden of proof to set aside a forum selection clause on grounds of inconvenience."  *Id.* at *14.

Here, although the forum selection clause constitutes "the parties' private expression of their venue preferences," *Stewart*, 487 U.S. at 30, private-interest factors overwhelmingly weigh in favor of litigating this case in West Virginia.  The insurable risk in this case—the underground storage tanks at the plant—is in West Virginia.  The discharge of petroleum products that is the foundation of the plaintiffs' claims occurred here.  Most of the witnesses that would be called, should this case proceed to trial, will be found in West Virginia.  This includes plant personnel—engineers, operators, cleanup personnel—as well as employees who filed the claim under the policy and who have interacted with the defendants.  Likewise, state officials from the DEP and other first responders will be in West Virginia.  Indeed, the only witnesses that might be found in New York

-13-

are the handful of Commerce's employees who made decisions regarding coverage under the policy.[4]  They will likely represent a small proportion of needed witnesses.  Therefore, convenience of the parties strongly weighs against transfer.

The availability of documentary evidence also counsels against transferring this case.  Not only will the plaintiffs' documentation of their communications with the defendants be in West Virginia, but so will evidence possessed by nonparties.  Common sense dictates that results of their various investigations of the plant will be here as well.  Similarly, evidence possessed by the DEP will be found in this district.

Furthermore, availability of process is a strong factor against transfer.  The majority of nonparties likely to be called as witnesses are located in West Virginia.  Were this case transferred to New York, however, these witnesses would not be subject to process.  While testimony by deposition is available, live testimony is preferred.  Additionally, the costs of obtaining these witnesses will be exacerbated by transferring this case to New York.

### 2.  Public-interests factors weigh against transfer

A court must also consider certain "public interest" factors.  Those factors include considerations of administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest of "having the trial of a diversity case in a forum that is at home with the state law that must govern the case"; the avoidance of

---

[4]  Commerce is the only defendant with New York citizenship.  The other defendants have corporate citizenship elsewhere.  While New York may be more convenient to Commerce, it is not apparent from the Complaint that it would be any more convenient for the other defendants.

-14-

unnecessary problems in conflict of laws; and the unfairness of burdening citizens in an unrelated

forum with jury duty. *Gulf Oil*, 330 U.S. at 508-09.

In *D/H Oil & Gas Co. v. Commerce & Indus. Ins. Co.*, 2005 U.S. Dist. LEXIS 42791 (N.D.

Fla. May 9, 2005), a gasoline station sued Commerce for refusing to pay under an insurance policy

for damage caused by a leaking underground storage tank.  Commerce moved for a change of venue

under the forum selection clause.  The court denied the motion.  Although it observed that "the

presence of documents and ease of access to sources of evidence, as well as the convenience of the

witnesses, weighs heavily in favor of retaining this dispute in a Florida forum," *D/H Oil & Gas Co.*,

2005 U.S. Dist. LEXIS 42791 at *14, the court relied primarily on public-interest considerations in

reaching its decision.

Citing a number of state laws regulating potential environmental hazards, the court explained

that "the public policy of the state in protecting its citizens from environmental contamination, and

specifically petroleum spills from underground storage tanks, is to strictly enforce minimum levels

of insurance to protect the public."  *Id.* at *16.  It observed that "the risk of the policy [was] wholly

centered in Florida, and involve[d] real property located in Florida."  *Id.* at *19.  The court

concluded that "transferring th[e] case to a federal court in New York, which has very little (or no)

connection to this dispute, would not be in the interest of justice.  While valid forum selection

clauses are to be enforced in most circumstances, this case plainly presents an exception to the

general rule."  *Id.* at *25.

This case presents public interests similar to those involved in *D/H Oil and Gas*.  Like

Florida, West Virginia has enacted a number of statutes expressing a public policy of protecting the

environment.  The West Virginia legislature has explained that "[r]estoring and protecting the

environment is fundamental to the health and welfare of individual citizens, and our government has a duty to provide and maintain a healthful environment for our citizens."  W. Va. Code § 22-1-1(a)(1).  It has stated that "[t]he state has the primary responsibility for protecting the environment; other governmental entities, public and private organizations and our citizens have the primary responsibility of supporting the state in its role as protector of the environment." *Id.* § 22-1-1(a)(2). West Virginia has further enacted a statute stating that it is the state's public policy to "maintain reasonable standards of purity and quality of the water of the state." *Id.* § 22-11-2(a).

More particular to this case, woven into the fabric of West Virginia public policy is the substantial state interest of protecting the public by regulating the insurance of underground storage tanks. The state regulates underground storage tanks through an extensive administrative scheme. *See id.* § 22-17 ("Underground Storage Tank Act").  The Underground Storage Tank Act establishes a number of requirements to store petroleum-based products underground in West Virginia. Particularly, the Act imposes requirements for "maintaining evidence of financial responsibility . . . for taking reasonable corrective action . . . caused by . . . accidental releases arising from operating an underground storage tank." *Id.* § 22-17-10.  "Such means of financial responsibility may include . . . insurance . . . ." *Id.*  Underscoring West Virginia's interest in this litigation is the fact that the policy insured a risk that was purely local to West Virginia.  West Virginians alone bear the externalities of the contamination caused by the petroleum product discharges and by the continued pollution.  *Cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991) (giving weight to fact that litigation was not inherently local in applying forum selection clause).

West Virginia has a significant interest in ensuring that petroleum spills are contained and remediated.  To protect that interest, it requires proof of financial responsibility as a prerequisite to

-16-

store petroleum products underground. In this case, West Virginia's public interest is particularly strong because the plaintiffs contend that further environmental remediation is required. This remediation could wind up being prohibitively expensive and might not occur if the policy does not cover the plaintiffs' costs. West Virginia thus has a strong interest in having this case litigated in the Southern District of West Virginia.

Transferring this case to a federal district in New York would also cause practical problems. Of the several defendants, only Commerce is a New York corporation. (Compl. ¶ 6.) AIG Domestic Claims and AIG Consultants are Delaware corporations, with their principal places of business in New Jersey. (*Id.* ¶ 7-8.) Arcadis is a Delaware corporation, with its principal place of business in Colorado (*id.* ¶ 12), while Kodiak is a Pennsylvania corporation, with its principal place of business there (*id.* ¶ 14). It is therefore possible that Commerce would be the only defendant subject to personal jurisdiction in New York. Unless the other defendants have substantial contacts with New York, the plaintiffs would have to pursue their claims aginst them in West Virginia, where the alleged harm occured. The plaintiffs would have to split their claims, litigating against Commerce in New York, and against the other defendants in West Virginia, with the same subject matter being litigated in each forum. Such a result would be an incredible waste of resources for the parties and the courts.

Having considered the public-interest factors involved in this case, it is clear that the interest of justice would best be served by having this case litigated in this district.

## IV.  Conclusion

In light of the forum selection clause, the plaintiffs bear the burden of establishing that West Virginia is a substantially more convenient place to litigate this case. They have, however, carried

-17-

their burden.  While the forum selection clause indeed provides for a New York forum, transferring this case would serve neither the convenience of the parties or the interest of justice.

The Motion to Dismiss [Docket 11] is **DENIED**.  The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party

ENTER:        December 4, 2009

Joseph R. Goodwin, Chief Judge